IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 04-cv-01072-ZLW-BNB

JOHN E. LOPEZ,

Applicant,

v.

CARL ZENON, and
KEN SALAZAR, The Attorney General of the State of Colorado,

Respondents.
_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

This matter is before me on the petitioner's **Amended Petition Pursuant to 28 U.S.C. Section 2254** [Doc. # 90, filed 8/14/2006] (the "Amended Application"). I respectfully RECOMMEND that the Amended Application be DENIED.

**I. BACKGROUND**

Following a jury trial, the petitioner was sentenced to life imprisonment in the Colorado Department of Corrections for first degree murder, one count of second degree burglary, one count of theft, and one count of robbery. *Amended Answer* [Doc. #94], Ex. B, p. 3; Ex. D, p. 3.[1] The petitioner directly appealed his judgment of conviction. Id. at Ex. B. The Colorado Court of Appeals reversed the conviction and remanded for a new trial. Id. at Ex. D. The appellate court held that the trial court had erroneously excluded the testimony of the petitioner's expert witness. The court rejected the petitioner's claim that his confession was involuntary and should

---

[1]I cite to the actual page numbers of the exhibits, not to the page numbers assigned by the court's docketing system.

not have been admitted as evidence at trial. Both the petitioner and the State sought certiorari review in the Colorado Supreme Court, *Amended Answer*, p. 4, which was denied on November 10, 1997. Id.

Prior to his second trial, the petitioner pled guilty to one count of second degree burglary and one count of theft. Id. at Ex. H, p. 1. After a jury trial, he was convicted of the remaining charges. Id. and Ex. F, p. 2. He was sentenced to a life term without parole. Id. at Ex. F, p. 2. The petitioner appealed his conviction, claiming that the prosecutor used four peremptory challenges to exclude jurors on the basis of their race or ethnic backgrounds in violation of the Equal Protection Clause. Id. at pp. 9-23. The appellate court affirmed the conviction. Id. at Ex. H. The Colorado Supreme Court denied certiorari on April 23, 2001. Id. at Ex. I. The Mandate issued on May 7, 2001. Id. at Ex. J.

On or about October 31, 2001, the petitioner filed a motion for postconviction relief pursuant to Rule 35(c) of the Colorado Criminal Rules of Procedure. Id. at Ex. K. He argued that he received ineffective assistance of trial counsel because counsel failed to move to suppress his confession prior to the second trial and because counsel had a conflict of interest. Id. The district court denied the motion on November 8, 2001. Id. at Ex. L. The petitioner appealed the denial of his postconviction motion. Id. at Ex. M. The appellate court affirmed the district court's order. Id. at Ex. O. The supreme court denied certiorari review on January 20, 2004. Id. at Ex. P. The Mandate issued on January 26, 2004. Id. at Ex. Q.

On May 14, 2004, the Court received the petitioner's initial Application for Writ of Habeas Corpus (the "Initial Application").[2] The Initial Application asserted one claim for violation of the petitioner's Fifth and Fourteenth Amendment rights based on the state courts' decision that his confession was not coerced.

On July 18, 2005, the petitioner's request for appointment of counsel was granted [Doc. #56], and counsel entered an appearance for the petitioner on July 22, 2005 [Doc. #57]. On August 4, 2005, I granted the petitioner leave to file an amended petition [Doc. #62]. The petitioner, through counsel, filed the Amended Application on August 14, 2006.[3]

The Amended Application asserts two claims. Claim One is the same claim asserted by the petitioner in his Initial Application. Claim Two asserts a claim of actual innocence based on new reliable evidence that his confession was coerced. The respondents concede that the petitioner exhausted Claim One. *Answer*, p. 10. Claim Two, however was not exhausted. *Recommendation of United States Magistrate Judge* [Doc. #109]. The petitioner was permitted to withdraw Claim Two on May 28, 2008. *Order* [Doc. #112].

## II. HABEAS LAW

This Court may review the petitioner's application for writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). If a petitioner exhausts his available state remedies, his

---

[2]The initial Application was filed on May 27, 2004.

[3]The petitioner, through counsel, filed a supplement to the Initial Application on July 13, 2006 [Doc. #83]. Because the petitioner was ordered to file an amended application which stood alone and did not incorporate the Initial Application, the supplement was stricken, and the petitioner was directed to file an amended application [Doc. #87].

application may be granted only if the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Factual determinations made by the state court are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### III. ANALYSIS

On April 21, 22, and 25, 1994, the Adams County District Court held an evidentiary hearing to address several motions pending in the petitioner's criminal case, including a motion to suppress the petitioner's confession. *Record*, Vols. 25, 26, and 27. The confession was made as a result of five days of interrogation by Sergeant Joe Dougherty from July 12, 1993, to July 16, 2003. *Notice of Filing* [Doc. #54] (containing transcripts and videotapes of the interrogation).

The Colorado Court of Appeals gave the following summary of the events surrounding the confession:

> In March 1993, defendant's stepfather was beaten and stabbed to death in the bedroom of his home. A safe containing an estimated $170,000 in cash and jewelry was taken from the home during the attack. No other valuables were removed.
>
> Defendant and a friend of his were immediate suspects and defendant was first questioned about the crime in March 1993. Although police lacked sufficient evidence to make an arrest, defendant's mother remained in contact with the investigating officer, urging him to solve the murder. The officer told her that defendant and his friend were involved in the crime, but that the police lacked evidence to arrest them.
>
> In a bizarre series of events, defendant's mother became entangled

4

in the case against defendant. In July 1993, she allegedly assaulted
him in the parking lot of a grocery store. Two days later she went
to see him, held a loaded gun to his head, and threatened to kill
him, herself, and his younger sister unless he went to the police to
talk to the investigating officer. That visit occurred on a Friday
and she gave him until Sunday to agree to her ultimatum.

The following Monday defendant appeared at the police station.
He was interrogated there about the murder that day and he also
left and returned every day during the next four days for further
interrogation. Not only was defendant's mother present at the
interrogations, but she actively assisted in questioning defendant.
During these interviews, which lasted nearly 30 hours over the
course of the five days, defendant admitted involvement in the
theft. In doing so, he implicated himself as a complicitor in the
murder of his stepfather and also in a previous theft from the
stepfather's home. Defendant's confession was the primary
evidence which led to the convictions at issue here.

*Amended Answer*, Ex. D, pp. 3-4.

The petitioner asserts that his confession was involuntary and should have been suppressed. He claims that his Fifth and Fourteenth Amendment rights were violated when the confessions was admitted at trial.

The Tenth Circuit Court of Appeals has summarized the clearly established law regarding determination of the voluntariness of a confession:

> Incriminating statements obtained by government acts, threats, or
> promises that permit the defendant's will to be overborne run afoul
> of the Fifth Amendment and are inadmissible at trial as evidence of
> guilt. Malloy v. Hogan, 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12
> L.Ed.2d 653 (1964). In determining whether a particular
> confession is coerced, we consider the following factors: (1) the
> age, intelligence, and education of the defendant; (2) the length of
> the detention; (3) the length and nature of the questioning; (4)
> whether the defendant was advised of [his] constitutional rights;
> and (5) whether the defendant was subjected to physical
> punishment. See Schneckloth v. Bustamonte, 412 U.S. 218, 226,
> 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). The determination of
> voluntariness is based on the totality-of-the-circumstances; none of

5

the single factors listed above is determinative.  Id.  Accordingly,
this court must be mindful of all of the circumstances surrounding
a defendant's interrogation, including the particular defendant's
characteristics.  See id.

United States v. Glover, 104 F.3d 1570, 1579 (10th Cir. 1997).

The state trial judge found that the petitioner's confession was voluntary, and he denied the petitioner's motion to suppress, ruling:

> I've had the opportunity to review the files, as I've indicated before, we've had an expansive opportunity to review the transcript of the interrogation, or the discussions, however you wish to characterize them, that began on July the 12th, and ended on July the 16th.  Read not only the transcript, but I've also actually viewed the videotape, which gives this Court a much better understanding as to what was occurring on that date, as far as the demeanor of the parties, the voice levels, et cetera, as well as hearing all of the witnesses today, and hearing -- or today and Tuesday -- excuse me, today and last Friday and I believe last Thursday.  Hearing the arguments of counsel today, and I'm ready to proceed at this point.
>
> I'm denying the motion to suppress.  I'm finding that by the totality of the circumstances, that the people have shown, by a preponderance of evidence, that the statements that were made, in fact, were voluntary statements; that the Defendant's will was not overborne; that the statements were not a product of in -- inappropriate coercion or pressure placed on the defendant, by the police authorities.
>
> When you have a -- a transcript, I suppose, which is of this length, there are certainly bound to be certain quotes or words some place in the 400 some odd pages which can be argued are inappropriate.  But I think that, again, this is where you have to look at the interview process, and the totality.
>
> I suppose, the Gennings case is as good a place as any to begin my looking at the factors.  They talk about regarding things to look at in making the determination of whether or not a -- a statement is -- is voluntary or involuntary.  I do note that the defendant was free to leave.  He was given his advisal of rights.  I do not find that there were any threats or promises that were placed upon the

6

defendant that were inappropriate, during the entirety of that statement by the police officers.

I think the defendant's demeanor, during that period of time, was that of a person that was very cool, very calculated, somebody who was well in command of the situation, knew exactly what was happening around him, made various choices throughout the -- the proceedings as to what he was going to say, and whether he was going to say it, and under what terms and conditions he was going to speak to the police.

He was well aware, I think, that at any time that he could stop the interrogation, and chose not to. The question I suppose has been posed regarding the March interview,[4] and whether or not the things that were stated during the March interview are threatening and coercive, and whether or not anything that was stated during the March interview to him by Captain Maudlin or anybody else, may have inappropriately tainted his statements that were made in July. And I do find that -- that assuming arguendo that the statements that were made in March were threatening or coercive, or could be viewed as such, I find that any taint from those statements clearly dissipated by the time that the July statements are made.

During that entire period of time he is at liberty, he is -- there may have been some very incidental contacts with the police between March and July, but they were no more than contact that any other civilian who lives within Commerce City would have with any other police officer. I think the only time that he saw Marino, for example, happened to be at the 4th of July celebration where Marino was directing traffic or something of that sort.

But there's certainly no indication that whatever may have been said to the defendant, or whatever perceptions of what had been said, or the tone of what was said in March had any affect, whatsoever, on the defendant in July.

The issue, I suppose, has been raised as to what -- what part Debbie Lopez played in this, and whether or not the conduct of Debbie Lopez is attributable to the police. Clearly the Court finds that what occurred prior to the 12th of July is not attributable to the

---

[4]The petitioner was also interviewed by the police in March 1993.

7

police. Debbie Lopez, when she, in her own words, got in the face of her son, either at the King Soopers or at her son's house, was acting alone. No indication that that conduct was known or authorized, in any fashion, by the police, or known or authorized by the police, at least as far as the incident which occurred at his house, even during the entirety of the -- of the interview.

I suppose the other thing that's instructive about it though, is what affect it may have had on the defendant. Even assuming arguendo, and I'm not accepting this as being true, because I'm not finding that she was the agent of the police at any time, but I think it's instructive, certainly interesting, that after Mrs. Lopez allegedly comes up to her son with a gun and threatens him to tell the truth, otherwise she's going to do him great bodily harm, that Mr. Lopez' reaction to that is that I didn't do anything. I'm not involved in this.

We don't have a situation where somebody is threatened with something and says okay, you got me. I'll tell you anything you want, just don't hurt me. We have a person who, again, in a very cool and calm in a deliberate fashion denies any involvement, any knowledge on any of this. And I say not just -- not to justify what Debbie Lopez said, but only to go to the issue of whether or not that conduct, as inappropriate as it may have been, whether or not that conduct can be shown as being something which caused the defendant's will to be overborne, whether or not the statements were a product of that conduct, and I find that there's no evidence to indicate that such was the case.

And the same applies throughout these interviews. Certainly there's discussion by Debbie Lopez, which is very pointed and very heated towards her son. But there's no indication, even in the face of all of that pressure, by his mother, that Mr. Lopez, changes his initial story, that he's not aware of anything, that went on. And there's no indication that Mrs. Lopez was an agent of the police at that point.

There's no indication, to this Court, that there was undue pressure placed upon Mr. Lopez, when he left the police department, by his mother, because, in fact, my understanding is that Mr. Lopez was staying with his grandmother during that period of time, and there's very little indication as to what contact he may have had with his mother.

I'm concerned, and was concerned, with the showing of the photograph. I think that the photograph was unduly gruesome. I have a hard time accepting the statement that this is the only photograph that could have been used. And this was a point when watching the video tapes when my interests were clearly peeked.

But as inappropriate as I believe that that was, I do not believe that the statement of the defendant was a product of showing that photograph, or that his will was overborne by that. And again, I think as evidence of that, is the fact that after the photograph is shown, Mr. Lopez persists in his statement that he was not involved, and that he has no knowledge of what occurred. And that very shortly after that, the parties took a break for the evening. And whatever impropriety may have occurred, I think is dissipated by that break, and there has been no showing, to this Court, that the statement that was made on succeeding days, and I believe that would have been the 14th, when there was at least a change in the statement, or more specifically, the statements that were made on the 15th and on the 16th, were a product of the showing of that photograph.

In all, the Court finds by a totality of the circumstances that the People have shown that the statement that was made by Mr. Lopez, and specifically the statements made on the 15th and more particularly on the 16th of July 1993, were, in fact, free and voluntary statements made by the defendant, and therefore the Court is going to deny the motion to suppress those statements. Okay.

*Record*, Vol. 27, pp. 54-59.

The state appellate court upheld the trial court's admission of the confession:

Defendant first contends that the statements he made during his interviews with police were involuntary and should have been suppressed. We disagree.

The prosecution may not use a defendant's involuntary statements for any purpose at trial. Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); People v. Branch, 805 P.2d 1075 (Colo.1991).

9

A statement is involuntary if coercive governmental conduct played a significant role in inducing it. Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); People v. Dracon, 884 P.2d 712 (Colo.1994); see also People v. Whalin, 885 P.2d 293 (Colo. App.1994). Such activity can take the form of overt physical abuse and threats or subtle forms of psychological coercion. Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); People v. Gennings, 808 P.2d 839 (Colo.1991).

In determining voluntariness, a court should consider the totality of the circumstances. People v. Breidenbach, 875 P.2d 879 (Colo.1994). Factors to be considered include:

[W]hether the defendant was in custody or was free to leave and was aware of his situation; whether Miranda warnings were given prior to any interrogation and whether the defendant understood and waived his Miranda rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or instead was volunteered; whether any overt or implied threat or promise was directed to the defendant; the method and style employed by the interrogator in questioning the defendant and the length and place of the interrogation; and the defendant's mental and physical condition immediately prior to and during the interrogation, as well as his educational background, employment status, and prior experience with law enforcement and the criminal justice system.

People v. Gennings, *supra*, 808 P.2d at 844.

A trial court's factual findings regarding voluntariness are entitled to deference on review. People v. Breidenbach, *supra*. However, the ultimate determination whether a statement is voluntary is a legal question and is reviewed de novo. See People v. Gennings, *supra*; see also Arizona v. Fulminante, *supra*.

Here, after a lengthy hearing and after viewing many hours of the videotaped interviews with defendant, the trial court made clear, specific findings relating to each factor specified in People v. Gennings, *supra*. Based on the totality of the circumstances, it determined with full record support that, although coercive techniques were used at various points in the interrogation, defendant's final statements regarding his role in the offenses

nevertheless were voluntary and did not result from coercive police tactics.

We also find no error in the trial court's conclusion that defendant's mother was not an agent of the police.

Constitutional violations resulting in the exclusion of evidence generally do not apply to evidence obtained by private parties or evidence resulting from the conduct of private parties. See Colorado v. Connelly, *supra* (outrageous behavior by private party seeking to secure confession against a defendant does not make evidence inadmissible under Due Process Clause). An exception to this rule exists when private persons become agents of the police by virtue of their suggestion, order, request, or participation for purposes of criminal investigation. People v. Henderson, 38 Colo. App. 308, 559 P.2d 1108 (1976).

The test as to whether a private citizen has acted as an agent of the police for purposes of criminal investigation is whether the person "in light of all the circumstances of the case, must be regarded as having acted as an 'instrument' or agent of the state." Coolidge v. New Hampshire, 403 U.S. 443, 487, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564, 595 (1971). Critical factors include whether the prosecution knew of and acquiesced in the intrusive conduct, and whether the party performing such intrusive conduct intended to assist law enforcement efforts. United States v. Black, 767 F.2d 1334 (9th Cir.1985), cert. denied, 474 U.S. 1022, 106 S.Ct. 574, 88 L.Ed.2d 557 (1985).

Here, the trial court found that the police did not initiate, induce, or acquiesce in the alleged assault and the gun incident preceding the police interrogations. Thus, while the involvement of defendant's mother in his interrogation was highly unusual and we do not condone it, we conclude that the trial court did not err in finding her conduct relevant to the totality of circumstances surrounding defendant's statements, but in not treating her as a police agent.

Accordingly, the trial court did not err in admitting the defendant's statements.

*Amended Answer*, Ex. D, pp. 4-5.

I have conducted a thorough review of the record, including the transcripts of the

interrogation and the suppression hearing and the videotapes of the interrogation.[5] The record supports a finding that, under the totality of the circumstances, the petitioner's statements were voluntary. The state courts' decisions are not contrary to, nor do they involve an unreasonable application of, established federal law. Nor did they result in a decision that was based on an unreasonable determination of the facts as presented at the suppression hearing.

The record before the state trial judge at the suppression hearing shows that the petitioner was eighteen years old at the time of the interrogation. *Record*, Vol. 25, p. 27. He was educated and intelligent and had completed the requirements for a G.E.D. or its equivalent in order to enter the military service. Id. at p. 29; Vol. 27, pp. 27-28. The entirety of the interrogation transcripts and the videotapes demonstrate that, with the exception of a short period of time after he was shown the picture of his stepfather, the petitioner was calm, thoughtful, deliberate in his speech, and appeared comfortable throughout the interrogation process. Docs. #54 (the "Videotapes" and the "Interrogation Transcripts").

The petitioner was interrogated for nearly thirty hours over the course of five days. *Amended Answer*, Ex. D, p. 4. He appeared for the interrogation voluntarily each day; he was free to leave at any time; and he was free to come and go as he pleased. *Record*, Vol. 25, p. 46; *Interrogation Transcripts*, p. 314. The petitioner acknowledged that Sgt. Dougherty was not

---

[5]The petitioner's claim is that his confession was involuntary and should have been suppressed. Thus, I examined the record before state court at the time of the suppression hearing to determine if the denial of the petitioner's motion to suppress (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the hearing. 28 U.S.C. § 2254(d). To the extent the parties refer to testimony in the trial transcripts, I cannot consider such testimony if it was not before the court during the suppression hearing.

12

pressuring him, *Interrogation Transcripts*, pp. 212-13, and he acknowledged that he came to talk to the police of his own free will. Id. at p. 314.

He was consistently advised of his constitutional rights throughout the interviews. *Interrogation Transcripts*, pp. 2, 26, 162-63, 241, 344; *Record*, Vol. 25, pp. 28, 34, 47, 53, 56, 63.

He was sober, lucid, and responsive throughout the interviews. *Interrogation Transcripts*, in their entirety; *Videotapes*, in their entirety; *Record*, Vol. 25, pp. 28-29, 34-35, 46, 48, 53, 55-56. There is no evidence that he was subjected to physical punishment during the interrogations. To the contrary, he appeared to be comfortable during the interviews. *Videotapes*, in their entirety.

The petitioner argues that the state courts' decisions "resulted in a decision based on an unreasonable determination of the facts." *Amended Application*, p. 11. He asserts that Mrs. Lopez became an agent of the police "as a result of the direction and manipulation fostered by Sgt. Dougherty," *Amended Application*, p. 9, and that her "outrageous behavior as an agent" coupled with "the coercive techniques of Sgt. Dougherty," resulted in an involuntary confession. Id. at pp. 10-11. The specific behaviors cited by the petitioner are (1) "Sgt. Dougherty stated to the Applicant that his mother would commit suicide if he didn't cooperate"; (2) Sgt. Dougherty showed the petitioner a bloody picture of his stepfather on the third day of interrogation; (3) and Sgt. Dougherty misled the petitioner into believing that the petitioner's friend was the primary target of the investigation. Id at p. 10.

As a preliminary matter, I note that although the petitioner claims that the state courts' decision was based on an unreasonable determination of the facts, he does not cite to the record to support his version of the facts. Factual determinations made by the state court are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This exacting standard necessarily entails specific citations to the record in order to rebut the factual determinations made by the state courts, not generalized statements of fact without *any* citation to the record.[6]

The petitioner argues that his statements were rendered involuntary because Sgt. Dougherty misled him into believing that his friend, Lawrence Sandoval, was the primary target of the investigation and that the petitioner needed protection by the police. *Amended Application*, p. 7. "Thus, Sgt. Dougherty made promises of leniency to the Applicant in an attempt to induce a confession." Id. There is no evidence in the record to show that Sandoval was not the primary target. In any event, the petitioner was specifically informed that he (the petitioner) was being investigated for murder, *Interrogation Transcripts*, p. 162, 344, and he was informed that it was not Sgt. Dougherty's job to offer "deals"; that was "the District Attorneys' part." Id. at p. 174.

---

[6] I note that the transcripts of the suppression hearing and the interrogation total more than 700 pages. It is not the Court's duty to search the transcripts for evidence to support the petitioner's factual statements. See Gross v. Burggraf Construction Co., 53 F.3d 1531, 1546 (10th Cir. 1995). It is the litigants' responsibility to provide the court with concise arguments, relevant facts, and specific citations to authorities and supporting evidence. Toth v. Gates Rubber Co., 2000 WL 796068, *8 (10th Cir. 2000).

Moreover, "[t]he policeman is not a fiduciary of the suspect." United States v. Rutledge, 900 F2d 1127, 1130 (10th Cir. 1990) (stating that to some extent, the law allows police to pressure, cajole, conceal material facts, and actively mislead). "The police are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties; they just are not allowed to magnify those fears, uncertainties, and so forth to the point where rational decision becomes impossible." Id. As discussed above, the record reflects that the petitioner remained calm, thoughtful, and deliberate in his speech throughout the interviews.

The petitioner argues that "Sgt. Dougherty stated to the Applicant that his mother would commit suicide if he didn't cooperate." Although the petitioner does not cite to the record to support this statement, I note that the petitioner opened the interviews by stating that he wanted to cooperate because "its time for my dad to rest in peace." *Interrogation Transcripts*, p. 1. Sgt. Dougherty stated that, in addition, his mother was "goin' through some hell. And she's gettin' to the point where she's homicidal/suicidal . . ." Id. The petitioner replied, "I noticed that." The petitioner then proceeded to undergo five days of interrogation, where he remained calm and deliberate.

Under Connelly, the police conduct must be "causally related to the confession." 479 U.S. at 164. Otherwise "there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Id. The trial court noted that when faced with 400 plus pages of transcripts, there were bound to be certain inappropriate quotes. *Record*, Vol. 27, p. 55. However, the trial court properly focused on the totality of the circumstances and found that the petitioner's demeanor during the interviews was "very cool, very calculated, somebody who was well in command of the situation" during most of the interrogation, "knew exactly what

15

was happening around him, made various choices throughout the -- the proceedings as to what he was going to say, and whether he was going to say it, and under what terms and conditions he was going to speak to the police." Id. The record supports these findings; it does not support a finding that Dougherty's referral to Mrs. Lopez's mental state caused the petitioner's will to be overborne and rendered his confession involuntary.

The petitioner also argues that his confession was coerced because Sgt. Dougherty showed him a bloody picture of his stepfather. The trial court found that, although showing the photograph was inappropriate, the petitioner's confession was not a product of the photograph and his will was not overborne. *Record*, Vol. 27, p. 59. The trial court based this finding on the fact that the petitioner persisted in his statements that he was not involved in the murder and had no knowledge of what occurred; the parties broke for the evening shortly after he viewed the photograph; and the petitioner did not confess until several days later. Id.

This finding is fully supported by the record. The photograph was shown on July 13, 1993, the second day of the interviews. *Interrogation Transcripts*, p. 217. After showing the petitioner the picture and discussing it with him for a few minutes, Sgt. Dougherty left the petitioner alone in the interview room. *Interrogation Transcripts*, p. 217. The petitioner did not make any incriminating statements during this time. Id. p. 218. To the contrary, he persisted in his statements that he did not remember the events of the night in question. Id. at p. 222, pp. 231-232. He went home a short time later to his grandmother's house. Id. at p. 241, *Record*, Vol. 27, p. 27. He did not confess until July 16, 1993, three days later. Id. at p. 357. There is nothing inherently coercive about confronting a suspect with a gruesome photograph, Muniz v.

16

Johnson, 132 F.3d 214, 219-220 (5th Cir. 1998), and the record does not support a finding that the petitioner's will was overborne by it.

Finally, the petitioner argues that "the state courts failed to consider relevant evidence that demonstrates that Deborah Lopez was transformed into an agent of the police before and during" the interrogations. *Amended Application*, p. 11.

The Supreme Court has held that in the search and seizure context, a private person is considered an agent of the police when, "in light of all the circumstances of the case," she must be regarded as having acted as an "instrument" or agent of the state. Coolidge v. New Hampshire, 403 U.S. 443, 487 (1971). The circuit court has further stated that "[i]n deciding whether a private person has become an instrument or agent of the government, two important inquiries are: 1) whether the government knew of and acquiesced in the intrusive conduct, and 2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends." Pleasant v. Lovell, 876 F.2d 787, 797 (10th Cir. 1989).

The trial court found that Mrs. Lopez' actions prior to the interviews were not attributable to the police because there was no indication that her actions at King Soopers or at her son's house were known or authorized by the police. *Record*, Vol. 27, p57. The petitioner does not cite any evidence in the record to rebut this finding, and I do not find any. To the contrary, Mrs. Lopez testified that her actions at the grocery store and at the petitioner's house were *not* at the direction of Sgt. Dougherty, and that he specifically stated that he could not tell her what to do. *Record*, Vol. 27, pp. 15, 26-27. In addition, Sgt. Dougherty testified that he was not "working with" Mrs. Lopez; she would call him to find out the status of the case; and he would inform her of the status. *Record*, Vol. 25, pp. 83, 86. Sgt. Dougherty also testified that

17

prior to July 12, 1993, he never gave Mrs. Lopez any instructions to conduct an investigation, and she never asked for any. *Record*, Vol. 25, p. 24.

The trial court further found that Mrs. Lopez was not an agent of the police during the interviews. *Record*, Vol. 27, p. 57. Importantly, the court found that, even assuming arguendo that Mrs. Lopez was an agent of the state during the interviews, there is no evidence to indicate that the petitioner's will was overborne by her behavior or that his statements were the product of her conduct because the petitioner does not change his story in the face of her pointed and heated discussion toward him. Further, there is no indication that she placed any undue pressure on him after he left the police department because he was staying with his grandmother. <u>Id.</u> at pp. 57-58. The record supports these findings, and the petitioner does not point to any clear and convincing evidence to rebut it. Sgt. Dougherty permitted the petitioner's mother to be present during a number of the interviews because the petitioner requested her presence and because Dougherty thought that the petitioner would be more comfortable with her present, in view of the petitioner's age. *Record*, Vol. 25, pp. 26-28, 44, 56. The petitioner did not ask to have his mother removed from the room, and he did not state that she was forcing him to be there or that he did not want to talk to Sgt. Dougherty. *Record*, Vol. 25, pp. 45-46. Sgt. Dougherty testified that he did not direct Mrs. Lopez to ask questions or make statements, and he did not tell her what questions to pose. <u>Id.</u> at p. 45. Mrs. Lopez testified that she did not ask any questions and was "kind of quiet" after the first two days of interviews. <u>Id.</u> at p. 29.

The state courts held that the totality of the circumstances demonstrated that the petitioner's confession was voluntary. The decisions are not contrary to established federal law, nor did they result in an unreasonable determination of the facts presented in the state court

proceeding. Moreover, the petitioner has not successfully rebutted the factual determinations made by the state court based on the totality of the circumstances. I find no basis upon which to grant the petitioner's Application. 28 U.S.C. § 2254(d).

## IV. CONCLUSION

I respectfully RECOMMEND that the Application be DENIED.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have 10 days after service of this recommendation to serve and file specific, written objections. A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed. R. Civ. P. 72(b); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. In re Key Energy Resources Inc., 230 F.3d 1197, 1199-1200 (10th Cir. 2000). A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review. United States v. One Parcel of Real Property, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated April 3, 2009.

BY THE COURT:

s/ Boyd N. Boland
United States Magistrate Judge